**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-3545

_____

All American Life Insurance Company,   *

    *

    Plaintiff,     *

    *   Appeal from the United States

    v.     *   District Court for the

    *   Eastern District of Arkansas.

Annette Billingsley; Andrew Vaccaro,   *

Jr.; Joseph Vaccaro; Laurie Hiegel,   *

    *

    Appellees,     *

    *

Agribank FCB,     *

    *

    Appellant.     *

_____

Submitted: May 21, 1997
Filed: August 29, 1997

_____

Before MURPHY, HEANEY, and MAGILL, Circuit Judges.

_____

MAGILL, Circuit Judge.

    The All American Life Insurance Company (All American) filed this interpleader diversity action in the district court[1] to determine whether the proceeds of Andrew

---

[1]The Honorable George Howard, Jr., United States District Judge for the Eastern District of Arkansas.

Vaccaro, Sr.'s $500,000 life insurance policy should go to Agribank FCB (Agribank)[2] or to Andrew Vaccaro, Sr.'s four children: Andrew Vaccaro, Jr., Joseph Vaccaro, Annette Vaccaro Billingsley, and Laurie Vaccaro Hiegel (collectively, the Vaccaros). Andrew, Jr. and Joseph owed $728,581.14 to Agribank, secured by the American Life policy and a separate $500,000 policy from Executive Life Insurance Company (Executive Life). The Executive Life policy lapsed shortly before Andrew Vaccaro, Sr. died. At the core of the dispute between the Vaccaros and Agribank is whether the Vaccaros waived their rights to the proceeds from the American Life policy and whether Agribank is equitably estopped from disclaiming that $464,447.62[3] of Andrew, Jr.'s and Joseph's debts was satisfied by the lapsed Executive Life policy. The district court found for the Vaccaros on these equitable issues.

During the pendency of this appeal, Agribank settled all of its disputes with Andrew, Jr. and Joseph.[4]

---

[2]During its years of business with the Vaccaros, Agribank went through several reorganizations. Agribank was formerly known as the Federal Land Bank of St. Louis and the Farm Credit Bank of St. Louis. For the sake of consistency, we will only refer to "Agribank."

[3]The parties stipulate that, had it not lapsed, the Executive Life policy would have been valued at $464,447.62 upon maturity.

[4]Andrew, Jr. and Joseph also brought a tort claim against Agribank for Agribank's alleged negligent impairment of collateral. A jury empaneled by the district court returned a verdict for Andrew, Jr. and Joseph on their tort claim, and found damages of $38,405. In addition to appealing the district court's equitable decisions on waiver and estoppel, Agribank had originally appealed the district court's judgment against Agribank on Andrew, Jr. and Joseph's tort claim, as well as the district court's determination of Agribank's setoff rights.

Agribank now appeals the district court's equitable decisions

---

During the pendency of this appeal, Agribank reached a settlement agreement with Andrew, Jr. and Joseph as to all claims. Agribank, Andrew, Jr., and Joseph subsequently filed a joint motion to dismiss Andrew, Jr. and Joseph from this appeal. We grant this motion.

that Billingsley and Hiegel did not waive their rights to the proceeds from the American Life policy and that Agribank is equitably estopped from disclaiming that $464,447.62 of Andrew, Jr.'s and Joseph's debts--which were secured by the American Life policy--was satisfied by the lapsed Executive Life policy. We affirm.

## I.

Andrew Vaccaro, Sr., Andrew, Jr., and Joseph owned a 3200-acre family farming operation in Lee and St. Francis Counties, Arkansas. Their corporation, Vaccaro Farms, Inc. (VFI), operated from the 1970s until 1992.

In 1981, VFI borrowed $3,100,000 from Agribank to purchase an additional 1800 acres of farmland. Shortly thereafter, a series of factors proved the investment ill-timed. See Trial Tr. at 119-21 (testimony of Joseph Vaccaro). Andrew Vaccaro, Sr. suffered a heart attack and underwent heart surgery. Flooding destroyed 80% of VFI's 4000-acre wheat crop two weeks before harvest. Diesel fuel prices doubled, interest rates stood at over 20%, there was a federally-imposed grain embargo, new diseases were infesting crops, and commodity prices dropped to a thirty-year low. The value of the land purchased by VFI plummeted to 50% of its purchase price within the first year of VFI's ownership.

VFI defaulted on the loan from Agribank in 1986, when the loan's principal and interest amounted to almost $3,700,000. VFI's attorney, Daniel Felton, negotiated with Agribank and reached a mutually-agreeable solution. All of VFI's 5000 acres of farmland was sold, and $2,400,000 of the revenues generated from the sale went to Agribank to partially satisfy Agribank's loan. VFI continued to farm the land as a tenant farmer. Agribank forgave approximately half of the remaining $1,300,000 of

-4-

the loan, while Andrew, Jr. and Joseph each executed a promissory note--one for $300,000 and the other for $345,000--to satisfy the remaining half. Andrew Vaccaro, Sr. was no longer liable for the original debt.

Andrew, Jr.'s and Joseph's notes were secured by a lien on their remaining real estate, by a second lien on crops and equipment, and by an assignment to Agribank of the proceeds from the American Life and Executive Life policies insuring Andrew Vaccaro, Sr. Andrew Vaccaro, Sr. had originally purchased the policies to give his children an inheritance, and Billingsley and Hiegel reluctantly agreed to assign the proceeds from the policies to Agribank. Agribank reserved the right to make required premium payments on the two life insurance policies, but was not required to do so.

VFI was restructured as a partnership between Andrew, Jr. and Joseph. In 1991 the partnership defaulted on the notes, went into bankruptcy, and Andrew, Jr.'s and Joseph's personal liabilities were discharged.

Prior to 1991, Andrew, Jr. and Joseph paid all of the premiums on the American Life and Executive Life policies--an amount over $250,000. While Billingsley and Hiegel did not pay any of the premiums, they also did not receive any income from the farming operation to which, they assert, they were entitled. The premiums became more and more expensive as Andrew Vaccaro, Sr. aged, and in 1991 the combined annual premiums of the policies amounted to approximately $56,000. By the end of 1991, Andrew, Jr. and Joseph were unable to pay the premiums.

In late 1990, Andrew, Jr. and Joseph's attorney, Daniel Felton (who had represented VFI), negotiated with Agribank to have Agribank assume responsibility for the payment of the premiums. John Jordan, the Agribank Senior Special Credit Officer who serviced the loan from 1988 through 1991, handled the negotiations for Agribank.

The one offer Agribank made to become legally responsible for the premium payments was rejected by the Vaccaros on December 26, 1991, because it would have made Andrew Vaccaro, Sr. again liable for the loan. Although not legally responsible for the premiums, Agribank paid the $9100 quarterly Executive Life premium for October 1991 on December 19, 1991.

In several "very frank" conversations with Andrew, Jr. and Joseph, Jordan made it clear that Agribank knew the importance of maintaining the policies.  J.A. at Tab 77 (memorandum from Jordan to Don Zwicker, Regional Vice President of Agribank).  As early as December 31, 1990, Jordan advised Agribank that "[i]nsurance premiums on the required life insurance are extremely expensive, but the borrowers [the Vaccaros] have continued to pay these premiums.  If they did not, I would recommend that [Agribank] advance the premiums as, from a very 'cold' perspective, insurance proceeds will likely eventually allow the two notes to be paid in full."  J.A. at Tab 76 (Loan Analysis Update).  Prior to February 21, 1991, Jordan again met with the Vaccaros.  Describing this meeting, Jordan wrote:

> [W]e will be facing a problem next year.  The insurance premiums are now $56,000 per year. [The Vaccaros] see no way to make these payments and pay the higher payment schedule that will kick in at that time.
>
> We had a very frank discussion.  They realize their father is in poor health.  They also realize that the only way to ever pay the $645,000 account is through the insurance.  They propose that the most important factor is to keep the premiums paid.  They further propose a slight increase in the payment schedule, also a possibility of lowering the level at which the additional payment provision would kick in.
>
> I am in full agreement with their general proposal as I agree that the most important factor is to keep the insurance in force.

J.A. at Tab 77.

Jordan communicated with the insurance companies through Louie Devereux, Andrew, Jr. and Joseph's insurance agent.  Jordan learned that Agribank "[c]ould use up all cash surrender value [of the policies] on [the] front end.  Would run each for one year or longer, depending on interest rate."  J.A. at Tab 84 (Aug. 30, 1991

memorandum).[5]   In an Agribank "Loan Approval/Action Worksheet," Jordan noted that "we don't have any choice but to pay the insurance premiums."  J.A. at Tab 86 (Nov. 26, 1991).

On December 26, 1991, after Agribank paid one premium, Jordan and Felton had a final discussion regarding the request that Agribank accept the legal obligation to pay the life insurance premiums.  In memorializing this discussion on December 31, 1991, Jordan wrote:

> Telephone call to Dan Felton, Atty.  Has had further discussions with his clients.  They just simply do not want their father involved again. That is why they gave [Agribank] everything they did in 1986.  Will not agree to our terms at present.  They also agree that the original agreement already allowed for what they were proposing and that they were raising the annual payment amount. . . .
>
> I reminded [Felton] that the account was delinquent due to the insurance being paid. That I would assume that a collection action would be initiated.  <u>That regardless of what happened from a legal standpoint (foreclosure, bankruptcy, etc.) that [Agribank] would continue to make the insurance payments and eventually</u>

---

[5]Devereux subsequently communicated with Executive Life that "[t]he assignee [Agribank] is sending you a check from their St. Louis office under separate cover for the quarterly premium due in October.  They will send another quarterly premium in January for the premium due 1/26/92." J.A. at Tab 91 (Dec. 19, 1991).  Devereux sent copies of this letter to Jordan, the Vaccaros, and Felton.  While Agribank did make the initial payment, Agribank never made the January 26 payment, nor did it notify the Vaccaros or Felton that it failed to make the second payment.

<u>would be paid in full</u>.

He is in basic agreement with everything and hopes that his clients and [Agribank] can still have an ongoing relationship, that the meeting with the Little Rock attorney and/or the outcome with the operating lender could change everything.

J.A. at Tab 98 (Dec. 31, 1991) (emphasis added).  During his conversation with Felton, Jordan also said that he would always recommend that Agribank pay the premiums, but that Agribank was not contractually required to pay the premiums.  See J.A. at Tab 132, 676-78 (testimony of Felton).[6]

Shortly after his conversation with Felton, Jordan moved to another position at Agribank and stopped servicing the Vaccaro account.  On January 16, 1992, Kevin Schieber, the Manager of Special Credit for Agribank, recommended in an internal memorandum that Agribank "quit paying" the insurance premiums.  See J.A. at Tab 107 at 503.  The memorandum noted that Executive Life was facing bankruptcy and that the cost of the premiums was likely to rise.

Thereafter, Agribank decided to stop paying the insurance premiums.  Agribank never notified Felton or the Vaccaros of this decision.  Andrew, Jr. and Joseph continued to receive insurance premium notices on a quarterly basis, but discarded them.

---

[6]In a subsequent internal Agribank memorandum, Jordan wrote:

Telephone call from Teresa, insurance office, Ron Worth called from Executive Life.  Has check in hand and everything is taken care of until 1/26/92 installment.

Follow up to make sure a copy of the statement is received.  I assume [Agribank] will make that installment.

J.A. at Tab 102 (Jan. 2, 1992).

Because no one else was paying the premiums, the American Life and Executive Life premiums were paid out of the cash value of the policies. The cash value of the Executive Life policy ran out, and the policy lapsed in April 1993. The American Life policy was still active when Andrew Vaccaro, Sr. died on June 12, 1994.

American Life brought this interpleader diversity suit to determine whether Agribank or the Vaccaros should receive the proceeds from the $500,000 American Life policy. American Life was dismissed as a party to the action, and the Vaccaros and Agribank were left to litigate their rights to the American Life policy proceeds. The principal issues raised by the Vaccaros and Agribank were the equitable issues of waiver and estoppel. The district court empaneled a jury, and allowed the jury to sit in an advisory capacity on the equitable issues.

The jury returned apparently contradictory advisory findings that all four of the Vaccaros had waived their rights to the American Life policy proceeds, and that Agribank was estopped from receiving policy proceeds as against Billingsley and Hiegel, but not against Andrew, Jr. and Joseph.

The district court found that, at the end of December 1991, the Vaccaros reasonably believed that Agribank was going to pay the insurance premiums, and that Agribank had a duty to notify the Vaccaros that it was not going to pay the premiums. Further, the court found that the Vaccaros had suffered in reliance on Agribank. Billingsley testified that she had the money to pay the insurance premiums, and the district court found that the Vaccaros would have paid the premiums had they known that Agribank was not making payments. The district court therefore held that Agribank was estopped from asserting its assignments to the American Life policy proceeds.

The district court rejected Agribank's argument for

waiver.  While noting that "[t]he parties all agree that the issues of estoppel and waiver are equitable . . . [and] the Court must determine these issues," Mem. Op & Order at 6, <u>reprinted in</u> J.A. at Tab 35, 240, the district court's analysis of waiver did little more than reconcile the jury's advisory finding of estoppel with its advisory finding of waiver.  The district court stated:

[Agribank] submitted the issue of waiver to the jury. The jury was instructed that [Agribank] had to prove the following: (1) that the Vaccaros knew they had a right to the Executive Life policy proceeds; (2) that they voluntarily surrendered that right; and (3) that the Vaccaros intended that they would forever be deprived of the benefits of the Executive Life policy proceeds. The jury found that all the Vaccaros had waived their rights to the Executive Life insurance policy proceeds.

Arguably, the verdict appears inconsistent; that is, having found waiver, the Vaccaros cannot prove estoppel. In an attempt to reconcile the inconsistency, and in light of the evidence presented to the jury, the Court is of the opinion that the jury understood the instruction to refer to the Vaccaros' actions in assigning the Executive Life policies to [Agribank]. That is, based on the instruction and the evidence, the jury could have found that the Vaccaros had voluntarily assigned their rights to the Executive Life policies. Such a finding, however, does not preclude a finding by the jury or the Court that [Agribank] is estopped to enforce its rights under the Assignment of the All American policy. Furthermore, a finding of estoppel is consistent with the jury's verdict regarding another action by [Agribank], that is, that [Agribank] negligently impaired the collateral.

Id. at 9-10, reprinted in J.A. at Tab 35, 243-44 (emphasis in original).

After adjusting for Agribank's setoff rights, the district court ultimately allocated the American Life policy proceeds to the parties in the following amounts:

-16-

```
Agribank:              $191,703.33
Billingsley:           $134,919.16
Hiegel:                $134,919.16
Andrew, Jr.:           $ 39,067.50
Joseph:                $ 39,067.50
```

See Appellant's Br. at 14.  The district court stayed its judgment, however, and the American Life policy proceeds remain in the registry of the district court.  Agribank now appeals.

## II.

Arkansas state law applies in this case, and this Court reviews the district court's interpretation of state law de novo.  See Salve Regina College v. Russell, 499 U.S. 225, 231 (1991).  Findings of fact, however, are reviewed for clear error.  See Fed. R. Civ. P. 52(a). Under Arkansas law, the determination of whether the elements of estoppel have been met is a question of fact. See Linda Elenia Askew Trust v. Hopkins, 688 S.W.2d 316, 319 (Ark. App. 1985).

The Arkansas Supreme Court has explained that the following four elements are necessary to establish estoppel:

(1) [T]he party to be estopped must know the facts;

(2) the party to be estopped must intend that the conduct be acted on or must act so that the party asserting the estoppel had a right to believe it was so intended;

(3) the party asserting the estoppel must be ignorant of the facts;  and

(4) the party asserting the estoppel must rely on the other's conduct and be injured by that reliance.

Office of Child Support Enforcement v. Wallace, 941 S.W.2d 430, 433 (Ark. 1997). "The party asserting estoppel must prove it strictly, there must be certainty to every intent, the facts constituting it must not be taken by argument or inference, and nothing

can be supplied by intendment."  <u>Ward v. Worthen Bank &</u>
<u>Trust Co.</u>, 681 S.W.2d 365, 368 (Ark. 1984).

The first and third of these elements have clearly
been satisfied.  Agribank knew that it was not paying the
insurance premiums and Agribank knew that the premiums
were not otherwise being paid.  Further, the Vaccaros did
not know that Agribank had decided to stop paying the
premiums and had in fact stopped paying those premiums.

We conclude that the fourth element has also been
satisfied in this case.  Agribank asserts that the
Vaccaros were not injured by Agribank's failure to inform
them that it would no longer pay the premiums because,
even if Agribank had so informed the Vaccaros, the
Vaccaros still could not have paid the premiums.
Agribank acknowledges that Billingsley testified that she
could and would have paid the premiums had she known that
Agribank was not paying the premiums.  <u>See</u> Appellant's
Br. at 42;  <u>see also</u> Trial Tr. at 378 (testimony of
Annette Billingsley that she was prepared to pay $56,000
in annual premiums indefinitely).  Because Billingsley
had never paid any premiums in the past, however,
Agribank essentially argues that this testimony should
not be credited.

While we agree that it is convenient for Billingsley,
after the fact, to declare that she would have been
willing to pay $56,000 in annual premiums indefinitely,
it is uniquely the province of the trial court to weigh
the credibility of a witness's testimony.  <u>See</u> <u>United</u>
<u>States v. Heath</u>, 58 F.3d 1271, 1275 (8th Cir.) ("A
district court's determination as to the credibility of

-20-

a witness is virtually unreviewable on appeal."), <u>cert. denied</u>, 116 S. Ct. 240 (1995). Further, in light of Andrew Vaccaro, Sr.'s failing health, the total value of the life insurance policies, and the large amount of money that the Vaccaros had already paid for the insurance, we do not believe that the district court clearly erred in finding that the Vaccaros could, and would, have paid the insurance premiums had they known that Agribank was not paying the premiums.

The closest issue is whether Agribank acted "so that the party asserting the estoppel had a right to believe" that Agribank intended to pay the premiums. Wallace, 941 S.W.2d at 433. Based on the conversations between Jordan and Felton, internal Agribank memoranda, and the letter from insurance agent Devereux to Executive Life, we conclude that it did.

Beginning in 1990, the Vaccaros communicated to Agribank the importance of maintaining the life insurance policies and their desire for Agribank to take over paying the premiums. Agribank repeatedly acknowledged its understanding of the policies' importance to Agribank's loan, and indicated that Agribank would continue premium payments if the Vaccaros were unable to do so. Agribank never contradicted the specific expectation, documented by insurance agent Devereux, that Agribank would make at least the January 1992 payment to Executive Life.

Agribank did, in fact, pay the October 1991 premium payment. In the final meeting between Jordan and Felton, Jordan specifically told Felton that he assumed that Agribank would pay the upcoming premiums. The totality of these ongoing discussions and reassurances, coupled with the payment of a premium and no statement that Agribank would discontinue payments, would, we believe, have led virtually anyone to reasonably believe that Agribank would continue paying the premiums.

Agribank raises a host of arguments why the Vaccaros should not have relied on these communications. Agribank suggests that the Agribank internal memoranda were not relevant to a finding of estoppel because the memoranda

were not accessed by the Vaccaros until after the policy lapsed. This argument ignores that the memoranda documented conversations between Jordan and the Vaccaros, and were therefore relevant to indicate the content and tone of the communications between Agribank and the Vaccaros. Agribank further notes that Jordan was not the ultimate decision maker at Agribank, and argues that therefore the Vaccaros should not have relied on his "assumptions." This disregards that Jordan was the individual with whom the Vaccaros

<u>always</u> communicated; while he may not have been the ultimate decision maker, he was the individual who always told the Vaccaros of Agribank's ultimate decisions.

Agribank raises two points which makes this a close question, however. First, Agribank notes that the Vaccaros rejected an explicit offer by Agribank to assume legal responsibility for the premiums. In rejecting this offer, Agribank contends, the Vaccaros cannot reasonably expect to still receive the benefits of the bargain without any of the liabilities.

The Vaccaros do not claim, however, that Agribank had a legal obligation to pay the premiums. Immediately after rejecting Agribank's offer, the Vaccaros were reassured by Jordan that Agribank would continue paying the premiums, although it was not legally required to do so. By making this assurance and clarification, Agribank effectively informed the Vaccaros that, although not contractually required to make payments, Agribank would continue to pay the insurance premiums. Accordingly, this argument fails.

Finally, Agribank argues that the Vaccaros could, and reasonably should, have independently learned that the premiums were not being paid. For almost a year and a half Andrew, Jr. and Joseph received premium notices from Executive Life--notices which they discarded. Andrew, Jr. and Joseph never contacted either the insurance companies nor Agribank to ensure that everything was proceeding according to their expectations. Because the Vaccaros did not check on the status of the premiums, Agribank contends, the Vaccaros had no right to believe

-24-

that Agribank was continuing payments.

It remains, however, that the Vaccaros never received actual notice that the premiums were not being paid. While a close question, we believe that it was reasonable for the Vaccaros to presume that the premium notices were informational only, and that Agribank was in fact maintaining the policies.

In sum, we conclude that it was simply inexcusable for Agribank to do all that it did to assure the Vaccaros that Agribank would continue to make premium payments, and then to decide--without a single phone call or letter to the Vaccaros--that Agribank was not going to make the premium payments. Had Agribank notified the Vaccaros of its intent to discontinue the payments, the Vaccaros could have paid the premiums themselves. Accordingly, we affirm the district court's judgment on estoppel.

## III.

Billingsley and Hiegel assigned their rights in both the Executive Life and American Life polices to Agribank. See Mem. Op. & Order at 4, reprinted in J.A. at Tab 35, 238. In so doing, Billingsley and Hiegel expressly surrendered all rights to the policies. See J.A. at Tabs 56 and 57 (assignments of rights to life insurance policies proceeds as collateral). Agribank contends that this surrender constituted a waiver under Arkansas law, and that Billingsley and Hiegel cannot claim estoppel to recover any part of the American Life policy proceeds.

The Arkansas Supreme Court has explained that:

> Waiver is the voluntary abandonment or surrender by a capable person of a right known by him to exist, with the intent that he shall forever be deprived of its benefits. It may occur when one, with full knowledge of material facts, does something which is inconsistent with the right or his intention to rely on that right.

Lester v. Mount Vernon-Enola Sch. Dist., 917 S.W.2d 540,

542 (Ark. 1996) (quotations omitted). Under Arkansas law, waiver is usually a question of fact. See Bright v. Gass, 831 S.W.2d 149, 153 (Ark. App. 1992).

Agribank's argument for waiver is meritless. In their assignment of their rights to the life insurance policies benefits, Billingsley and Hiegel pledged $1,000,000 of total benefits to secure approximately $720,000 of debt. The assignment of benefits was explicitly considered collateral. Indeed, in the documents that executed the assignments, Agribank agreed that "any balance of sums received hereunder from the Insurer remaining after payment of the then existing Liabilities, matured or unmatured, shall be paid by the Assignee to the persons entitled thereto under the terms of the Policy had this assignment not been executed." J.A. at Tab 56, ¶ E, § 1 and Tab 57, ¶ E, § 1.

Clearly, Billingsley and Hiegel did not intend to "forever be deprived of" the life insurance policies benefits. Lester, 917 S.W.2d at 542 (quotations omitted). Rather, they anticipated receiving over a quarter of a million dollars when the benefits of the policies were realized and the debts to Agribank were satisfied. In light of this anticipation, which was supported by the assignment documents, Billingsley and Hiegel did not waive their rights to the life insurance policies proceeds.

**IV.**

For the foregoing reasons, we affirm the district court's holdings that Billingsley and Hiegel did not waive their rights to the American Life policy proceeds and that Agribank should be estopped from disclaiming that $464,447.62 from the lapsed policy did not go to satisfy Andrew, Jr.'s and Joseph's debts.

-28-

A true copy.

Attest:

    CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.