# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 25, 2017   Decided July 20, 2018

No. 16-7065

OSCAR SALAZAR, BY HIS PARENTS AND NEXT FRIENDS, ADELA
AND OSCAR SALAZAR, ET AL.,
APPELLEES

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLANTS

CHARTERED HEALTH PLAN,
APPELLEE

———

Consolidated with 16-7085, 16-7100

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:93-cv-00452)

———

*Richard S. Love*, Senior Assistant Attorney General,
Office of the Attorney General for the District of Columbia,
argued the cause for appellants. With him on the briefs were
*Karl A. Racine*, Attorney General, *Todd S. Kim*, Solicitor
General at the time the briefs were filed, and *Loren L. AliKhan*,
Deputy Solicitor General at the time the briefs were filed.

2

*Kathleen L. Millian* argued the cause for plaintiffs-appellees. With her on the briefs were *Martha Jane Perkins*, *Zenia Sanchez Fuentes*, and *Lynn E. Cunningham*.

*Jonathan H. Levy, Allen Snyder,* and *Daniel Bruner* were on the brief for *amici curiae* Legal Aid Society of the District of Columbia, *et al*. in support of appellees.

Before: HENDERSON and MILLETT, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: This case involves an injunction garbed in the clothing of a consent decree modification. While district courts generally have discretion under Federal Rule of Civil Procedure 60(b)(5) to adjust the terms of an existing consent decree in light of changed circumstances, the issuance of a new injunction must meet the strict preconditions for such exceptional relief set out in Federal Rule of Civil Procedure 65. Because the district court's order in this case provided brand new relief based on brand new facts alleging violations of a new law without the requisite findings for an injunction, it crossed the line from permissibly modifying into impermissibly enjoining. For that reason, we reverse the district court's order, vacate the new injunctive relief, and remand for proceedings consistent with this opinion.

**I**

**A**

By way of background, under long-established practice, federal courts may enter, as final judicial orders, consent decrees that reflect the agreement of the parties to forward-

going injunctive relief, as long as the consent decree arises from and resolves a dispute "within the court's subject-matter jurisdiction[.]" *Frew v. Hawkins*, 540 U.S. 431, 437 (2004). Once a consent decree has been entered, Federal Rule of Civil Procedure 60(b) empowers the court to modify its terms to the same extent as any other final judgment. *See United States v. Western Elec. Co.*, 46 F.3d 1198, 1205 (D.C. Cir. 1995) (citing *System Fed'n No. 91 v. Wright*, 364 U.S. 642, 651 (1961)); *see also Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 233–234 (1995) ("Rule 60(b) * * * merely reflects and confirms the courts' own inherent and discretionary power, firmly established in English practice long before the foundation of our Republic, to set aside a judgment whose enforcement would work inequity.") (internal quotations and citations omitted).

As relevant here, Rule 60(b) permits modification or relief from a judgment when: (i) it "has been satisfied, released or discharged;" (ii) "it is based on an earlier judgment that has been reversed or vacated;" (iii) "applying it prospectively is no longer equitable," FED. R. CIV. P. 60(b)(5); or (iv) there is "any other reason that justifies relief," FED. R. CIV. P. 60(b)(6).

When a party seeks relief under Rule 60(b), that party bears the threshold burden of proving that a "significant change" in legal or factual circumstances "warrants revision of the decree." *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383 (1992). For a change in the law to be significant, it must "make legal what the decree was designed to prevent," or otherwise effect a material change in the governing legal regime. *Id.* at 388. A change in the facts qualifies as significant if it makes compliance with the decree "substantially more onerous," "unworkable because of unforeseen obstacles," or "detrimental to the public interest." *Id.* at 384.

4

**B**

Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.*—commonly known as Medicaid—is a federal subsidy program that underwrites participating States' provision of medical services to "families with dependent children and [to] aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1382 (2015) (quoting 42 U.S.C. § 1396-1). Participating States receive federal funds that are subject to congressionally mandated controls and directives. *See id.*

With exceptions not relevant here, both federal and local law have long required the District of Columbia to make Medicaid eligibility determinations within 45 days of an application for benefits, 42 C.F.R. § 435.912(c)(3); D.C. Code § 4–205.26, and to provide Medicaid recipients timely notice of any proposed termination, discontinuation, or suspension of eligibility, *see, e.g.*, 42 C.F.R. §§ 435.919(a), 431.200 (1993). As a general rule, the District must annually "recertify"—that is, renew—the eligibility of its Medicaid recipients to maintain their benefits. *Compare* 42 C.F.R. § 435.916 (2016) (prescribing "renewal" of Medicaid eligibility), *with Salazar v. District of Columbia*, 954 F. Supp. 278, 292–294 (D.D.C. 1996) ("*Liability Order*") (referring to the legacy eligibility redetermination process as "recertification").

Historically, the District conducted the application and recertification processes by paper and mail. That system required beneficiaries to take the affirmative step of mailing in the required paperwork to continue their benefit eligibility. *See Liability Order*, 954 F. Supp. at 282–283, 292.

In 2010, the Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119 *et seq.* ("Affordable Care Act"), wrought several changes in the District's eligibility and recertification processes. Under the Affordable Care Act, the majority of Medicaid applicants and recipients have their eligibility determined by the amount of modified adjusted gross income that they report on their federal income taxes. The Act thus uses household tax information to assess income, household composition, and family size. *See* 42 C.F.R. §§ 435.901–435.911, 435.916.

For such tax-based eligibility determinations, the District had to replace its old paper recertification system with a new passive renewal model. The passive renewal program first attempts to automatically renew eligibility based on available electronic federal and local tax records. *See* 42 C.F.R. § 435.916(a). If the data necessary for passive renewal are unavailable, then the District must ask the Medicaid recipient to provide the missing information before renewing Medicaid eligibility. *Id*. § 435.916(a)(3).

The District began to implement its passive renewal system in late 2012 by building a new, automated eligibility system called the DC Access System. When the DC Access System is fully realized, the District plans to retire its legacy application and recertification system. However, the transition from the old system to the new DC Access System has been halting, due to "technology challenges, contracting issues, and funding." J.A. 827. The plodding transition between systems proved problematic for many individuals' Medicaid application and renewal process. J.A. 1298.

6

**C**

**1**

In 1993, long before the Affordable Care Act emerged on the scene, Plaintiffs—a broad group of Medicaid applicants and recipients—filed a class action against the District of Columbia principally alleging that the District's administration of its Medicaid program violated the Medicaid statute, its implementing regulations, District of Columbia law, and the United States Constitution.

The putative class action proved actually to be an amalgamation of several subclasses, and within each subclass the Medicaid applicants and recipients asserted a distinct and "particular set of claims." *Salazar v. District of Columbia*, 106 F. Supp. 3d 114, 115 (D.D.C. 2015). In 1994, the district court certified a class consisting of five Subclasses. The first two Subclasses, which involved Medicaid-eligible newborns and certain hospitalized applicants, settled before trial and are not at issue here. Of the remaining three, Subclass III consisted of individuals who alleged delayed processing of their initial Medicaid applications. Subclass IV consisted of individuals who alleged that the District failed to comply with pre-Affordable Care Act requirements to provide adequate advance notice of the termination or suspension of Medicaid eligibility. *Liability Order*, 954 F. Supp. at 326–328. And Subclass V consisted of individuals alleging that the District failed to give notice of or to provide the early and periodic screening, diagnostic, and treatment services required for Medicaid-qualified children ("Early Childhood Services") required by 42 U.S.C. § 1396a(a)(43) (1996).

After a bench trial in 1996, the District was found liable to Subclasses III, IV, and V for numerous violations of the law.

*See Liability Order*, 954 F. Supp. at 280–281, 324–333. For the Medicaid applicants composing Subclass III, the district court found that the District failed to meet the 45-day deadline for processing Medicaid applications for over half of all pending applications. *Id*. at 325–326. The District's delay left more than a hundred sick and impoverished children and adults without medical treatment each month. *Id*. at 325.

As for the individuals in Subclass IV facing suspension or termination of their benefits, the court held that a pattern of critical failures in the District's Medicaid recertification process violated the due process rights of the Subclass members and also ran afoul of various statutes and regulations. *Liability Order*, 954 F. Supp. at 326–327.

Finally, for the children and their parents that composed Subclass V, the court ruled that the District was violating its Early Childhood Services obligations by failing (i) to adequately notify eligible families about Early Childhood Services, (ii) to ensure that children eligible for such services receive complete screening services and necessary follow-up diagnoses and treatments, and (iii) to provide scheduling and transportation assistance to Early Childhood Services recipients. *Liability Order*, 954 F. Supp. at 328–333.

**2**

The District appealed. In 1999, while that appeal was still pending, the parties reached a settlement agreement, which the district court approved as the governing Consent Decree in this case. The Consent Decree divided the District's obligations by sections that very roughly mapped onto the remaining Subclasses, albeit (alas) with non-corresponding roman numerals.

Sections II and IV of the Consent Decree (which, to escape all the roman numerals, we will refer to as the "Eligibility Provisions") addressed Subclass III's grievances concerning the District's slow handling of initial Medicaid applications. It generally required the District to determine Medicaid eligibility within 45 days of an application's submission.

Section III of the Consent Decree (the "Renewal Provisions") addressed the District's failure to provide the legally required notice to Subclass IV members of the need to renew their Medicaid eligibility, and it mapped out a detailed schedule for the District to follow in processing recertification forms and providing advance notice to beneficiaries of the District's eligibility determinations.

Finally, Sections V and VI (the "Early Childhood Provisions") remedied the District's failures to provide notice of and to deliver Early Childhood Services to the Subclass V members by requiring the District to adopt a variety of measures designed to improve access to and the provision of Early Childhood Services. Section V of the Consent Decree applies only to "Medicaid recipients"—that is, persons already enrolled in the Medicaid program. Section VI of the Consent Decree required the District to "effectively inform all pregnant women, parents, child custodians, and teenagers" whom the District had "found eligible for Medicaid benefits" of the availability of Early Childhood Services. J.A. 286 ¶ 54.

Each Consent Decree section prescribed specific criteria for measuring when the District had satisfied the terms of the Consent Decree and could exit from its governance, generally framed in terms of demonstrated levels of compliance over a

specified period of time. [1] The Consent Decree would automatically terminate in its entirety "at the same time" the last remaining section of the Consent Decree was satisfied and coverage ended. J.A. 296.

The district court "retain[ed] jurisdiction of this matter to make any necessary orders enforcing or construing this Order." J.A. 296 ¶ 79. The Decree also provided that either party could, at any time, move the court to modify the Consent Decree if a "change of law" materially affected the District's continuing obligations under the Consent Decree. J.A. 293 ¶ 70. The district court's review of any request for modification was to be controlled by the "general body of federal law governing motions to modify orders in contested matters pursuant to Rule 60(b) of the Federal Rules of Civil Procedure[.]" J.A. 294 ¶ 72.

---

[1] *See, e.g.*, J.A. 254 ¶ 8, 294 ¶ 74 (establishing that the District would satisfy the Eligibility Provisions' application processing obligations by timely processing at least 95% of all initial applications averaged over any four consecutive months for three years); J.A. 261 ¶ 17, 262 ¶ 19, 294–295 ¶ 75 (the Renewal Provisions' recertification compliance would be satisfied upon the District's processing of at least 95% of all recertifications for "non-Public Assistance, non-foster care, Medicaid recipients" averaged over any four consecutive months for three years); J.A. 295 ¶ 76 (District could end court oversight of the Early Childhood Provisions' eligibility renewal processes by showing its systems "accurately confirmed the eligibility status of 98% of all requests for eligibility verification for twenty-two (22) of twenty-four (24) consecutive months and accurately confirmed the eligibility status of at least 95% of all requests for each of the other two (2) months * * * and have accurately confirmed the eligibility status of at least 98% of all requests for" one month that Plaintiffs were designated to randomly select).

**3**

Over the next fourteen years, several provisions of the Consent Decree terminated.  In 2009, the parties agreed that the District had come into compliance with the standards governing the timely processing of initial Medicaid applications for the Plaintiffs in Subclass III.  As a result, the district court "vacated" the Eligibility Provisions (Sections II and IV) of the Consent Decree.  *Salazar v. District of Columbia*, No. 93-452, MINUTE ORDER (D.D.C. Feb. 24, 2009) ("*2009 Vacatur Order*").  The district court also specifically ordered that its "supervision over" the Eligibility Provisions of the Consent Decree "is ended."  *Id.* (adopting the language of the proposed order).

The Renewal Provisions for Subclass IV were the next to go.  The District requested termination of the Renewal Provisions following enactment of the Affordable Care Act because that law materially changed the law governing the renewal of beneficiaries' Medicaid eligibility.  Specifically, the Act required the District (and States) to implement a passive renewal system that started with the individual's federal tax filing and generally required no affirmative action by the beneficiary.  *See* 42 U.S.C. § 1396a(e)(14); 42 C.F.R. § 435.916(a)(2).

In October 2013, the district court granted the District's motion.  The court explained that the Affordable Care Act "created a 'significant change in circumstances'"—indeed, "almost a seismic change" in the governing law—"that justifies termination of the [Renewal P]rovisions of Section III[.]" *Salazar v. District of Columbia*, 991 F. Supp. 2d 34, 37 (D.D.C. 2013) ("*2013 Termination Order*") (citing FED. R. CIV. P. 60(b)(5)).  "There is simply no comparison," the court continued, "between the statutory framework that existed at the

time th[e] Court made its factual findings in 1996 and what implementation of the [Affordable Care Act] envisions." *Id*. The two legal regimes are "apples and oranges." *Id*.

In particular, the Affordable Care Act's "brand new recertification procedure" was "in direct conflict with the renewal process set forth in" the Renewal Provisions of the Consent Decree, and rendered the steps required of the District under the notice requirements of the Consent Decree "inaccurate, confusing, and unnecessary." *2013 Termination Order*, 991 F. Supp. 2d at 37. Even the Plaintiffs "concede[d] that the [Renewal P]rovisions * * * are either in conflict with the [Affordable Care Act] or are outdated and * * * no longer relevant." *Id*. at 38. The court accordingly entered an order providing that the District was "relieved from complying with" the Renewal Provisions. *Id*. at 39. The Plaintiffs did not appeal that decision.

After the *2009 Vacatur Order* and the *2013 Termination Order*, no provisions of the Consent Decree relating to Medicaid eligibility determinations or renewals remained in effect. The only portions of the Consent Decree that were still operative on the District were the Early Childhood Provisions, which governed issuing notice about and the delivery of Early Childhood Services for already Medicaid-eligible children and their family members in Subclass V. Over the next two years, the parties continued to litigate various issues concerning those portions of the Consent Decree, as well as ancillary reimbursement issues.

**D**

In December 2015, the Plaintiffs filed a motion for a preliminary injunction to require the District to (i) provisionally approve all Medicaid applications that had been

pending for more than 45 days, until the District made a final determination, and (ii) continue the eligibility of all Medicaid recipients due to be renewed, until the District was able to demonstrate that its technology and business processing systems function in an adequate and timely manner. The motion alleged widespread failures by the District to process Medicaid applications and renewals under the Affordable Care Act, as well as significant technological problems that resulted in the improper termination of Medicaid benefits.

While the preliminary injunction motion was being briefed, the District resolved "all of the thousands of remaining" Medicaid processing errors. *Salazar v. District of Columbia*, 177 F. Supp. 3d 418, 440 (D.D.C. 2016) ("*2016 Order*").

Roughly one week after briefing on the preliminary injunction concluded, the Plaintiffs filed a motion under Federal Rules of Civil Procedure 60(b)(5) and (b)(6) to "modify" the Consent Decree to achieve precisely the same relief as the pending motion for a preliminary injunction, with the small difference that the Rule 60(b) motion also asked for monthly reporting by the District. *Salazar*, No. 93-452, PLS.' MOTION FOR MODIFICATION OF THE SETTLEMENT ORDER, ECF No. 2093 at 1 (Feb. 9, 2016); *see 2016 Order*, 177 F. Supp. 3d at 423 (noting that the two motions "request precisely the same relief").

On April 4, 2016, the district court granted the Plaintiffs' motion to modify the Consent Decree and then denied the motion for a preliminary injunction as moot. *2016 Order*, 177 F. Supp. 3d at 423–424. The court recognized that its decision provided the Plaintiffs "additional injunctive relief, based on the new [post-Affordable Care Act] factual circumstances." *Id.* at 441 (internal quotation omitted) (emphases in original).

The court also acknowledged that, because of its past modifications, "no provisions of the [Consent Decree] relating to Medicaid application processing or benefits renewal remained in effect," and that the "only portions" of the Consent Decree still "in force" applied to "programmatic elements of the District's Medicaid program * * * related to the delivery of [Early Childhood Services]." *Id*. at 426. The district court nonetheless decided that "common sense" dictated that "issues affecting initial applications and renewals are clearly related to" the remaining Subclass seeking Early Childhood Services because "a child cannot obtain [these services] when he or she lacks Medicaid eligibility." *Id.* at 442–443 (internal quotation omitted).

On that basis, the district court ordered the District (i) to provisionally approve all Medicaid applications pending more than 45 days, and (ii) to continue for ninety days the eligibility of Medicaid recipients who were up for renewal. *See 2016 Order*, 177 F. Supp. 3d at 443–445. In neither case did the district court confine its relief to children or families with children. The court also ordered that these remedies "remain in place" indefinitely, "until [the District] demonstrate[d] to the [c]ourt" that the District's technology systems were "functioning as required to ensure and protect the rights of Medicaid recipients and applicants[.]" *Id*. at 442 n.16 (internal quotation omitted). In so ruling, the court acknowledged the District's "substantial progress * * * in addressing the problems caused by changes in its administration of the Medicaid program to comply with the [Affordable Care Act]." *Id*. at 423; *see also id*. at 430, 435. Still, the court decided it was appropriate to impose structural injunctive relief because the District had not "entirely remediate[d]" all of the identified problems, *id*. at 430, and the court had "no assurance" that eligibility determination issues "w[ould] not arise again," *id*. at 441.

14

The district court subsequently entertained several motions concerning the *2016 Order*. On May 17, 2016, the court granted the District's motion to stay the *2016 Order* pending appeal. *Salazar*, No. 93-452, ORDER GRANTING MOTION TO STAY, ECF No. 2134 (D.D.C. May 17, 2016). Two weeks later, the court denied the District's motion to alter or amend the *2016 Order* because the stay was in place and the District's appeal of the *2016 Order* was already pending in this court. *Id.*, ORDER DENYING MOTION TO AMEND, ECF No. 2141 (D.D.C. June 2, 2016). Finally, on July 12, 2016, the district court granted in part Plaintiffs' motion to narrow the stay entered in May, causing portions of the *2016 Order* to go into immediate effect. *Id.*, ORDER GRANTING IN PART MOTION TO MODIFY STAY, ECF No. 2150 (D.D.C. July 12, 2016). The District appealed the district court's April 4th, June 2nd, and July 12th Orders separately, and we consolidated the three appeals.

**II**

The district court exercised jurisdiction over the class action under 28 U.S.C. § 1331, and we have jurisdiction over the district court's decision granting or modifying a consent decree under 28 U.S.C. § 1292(a)(1).

We generally review orders on Rule 60(b) motions for an abuse of discretion, *Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1138 (D.C. Cir. 1988), unless the decision is "rooted in an error of law," *id.* at 1138, in which case our review is *de novo*, *see, e.g.*, *Smith v. Mallick*, 514 F.3d 48, 50 (D.C. Cir. 2008).

15

**III**

There is a critical difference between a district court's power to modify an ongoing consent decree and its authority to impose a new injunction.  By trying to force the square peg of a new injunction into the round hole of modification, the district court impermissibly crossed that line.

An injunction is an exceptional form of relief.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–166 (2010). Doubly so when the judicial branch undertakes to restructure the operations of an executive branch of government and to superintend its operations on an ongoing basis.  *See Horne v. Flores*, 557 U.S. 433, 449 (2009) ("Injunctions of this sort bind state and local officials to the policy preferences of their predecessors and may thereby 'improperly deprive future officials of their designated legislative and executive powers.'") (quoting *Frew*, 540 U.S. at 441); *Rizzo v. Goode*, 423 U.S. 362, 379 (1976) ("[In] a system of federal courts representing the Nation, subsisting side by side with 50 state judicial, legislative, and executive branches, appropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief.").

Ordinarily, to obtain a running structural injunction, the plaintiff bears the burden of proving both the facts that warrant such intrusive relief and that (i) the plaintiff(s) suffered an irreparable injury, (ii) traditional legal remedies cannot redress the injury, (iii) the balance of hardships between the parties justifies extraordinary relief, and (iv) the injunction is not counter to the public interest.  *See*, *e.g.*, *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

The standard for obtaining a consent decree is somewhat less demanding, but that is because it depends centrally on the parties' mutually agreed resolution of a legal dispute. *Local 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 521–522, 525 (1986). To have their agreement ratified by a court as a consent decree, the decree's terms must "spring from, and serve to resolve, a dispute within the court's subject-matter jurisdiction; must come within the general scope of the case made by the pleadings; and must further the objectives of the law upon which the complaint was based." *Frew*, 540 U.S. at 437.

When an injunction or consent decree has been entered as a final judgment, the district court retains the authority under Federal Rule of Civil Procedure 60(b) to provide "[r]elief from [the] Judgment" if, as relevant here, "applying it prospectively is no longer equitable," or "any other reason * * * justifies relief" from the injunctive order. FED. R. CIV. P. 60 (title) & 60(b)(5) & (6). Rule 60(b)'s standard is a "flexible" one. *Rufo*, 502 U.S. at 393; *see Horne*, 557 U.S. at 450–451. Still, because exercise of the court's power under Rule 60(b) reopens a final judgment, the party requesting modification bears the burden of proving that "a significant change in circumstances"—whether factual or legal—justifies revision of the order. *Rufo*, 502 U.S. at 383; *see id*. at 384. Any adjustment of the order must be "suitably tailored to the changed circumstance[s]," *id*. at 383, 391, and a court "should do no more" than is necessary to "resolve the problems created by the change in circumstances," *id*. at 391.

As Rule 60(b)'s title indicates, the overwhelming majority of motions to modify the terms of a consent decree are filed by the *enjoined* party seeking "relief from" the court's judgment. That is not to say that such Rule 60(b) motions can never be filed by the plaintiff seeking to enforce the terms of the

injunction. We have previously recognized that a court's "broad[] and flexible" equitable powers, which Rule 60(b) codifies, may allow a district court to "tighten [a] decree" as well. *Western Elec.*, 46 F.3d at 1202. That makes sense. A district court must retain the authority to prevent evasion and ensure effectuation of the order it entered. But any such fortification of the injunction's terms must be in service of the consent decree's original "intended result." *Id.*

When a plaintiff seeks to enhance a consent decree's terms, courts must be careful to ensure that the new injunctive terms give effect to and enforce the operative terms of the original consent decree. Courts may not, under the guise of modification, impose entirely new injunctive relief. That practice would end run the demanding standards for obtaining injunctive relief in the first instance, would deny the enjoined party the contractual bargain it struck in agreeing to the consent decree at the time of its entry, and would destroy the predictability and stability that final judgments are meant to provide. *Frew*, 540 U.S. at 437; *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971) ("[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.").

Undoubtedly in some cases, the line between the permissible tautening of an injunction's terms and the impermissible imposition of a new injunction will be difficult to discern. Not so here. This injunction comes as an injunction.

*First*, the district court's opinion admits as much. The decision announced that it was imposing "<u>additional</u> injunctive relief, based on the <u>new</u> factual circumstances," *2016 Order*, 177 F. Supp. 3d at 441 (emphases in original), arising from the

District's asserted violations of a *new* law—the Affordable Care Act—that did not even exist at the time the Consent Decree was entered, *see id.* at 440. Nor was the district court's order aimed at enforcing a point of relevant overlap between the longstanding Medicaid statute and the new Affordable Care Act. As the district court previously found, the two renewal schemes are "apples and oranges," and "there is simply no comparison between the statutory framework[s]" because the Affordable Care Act worked "almost a seismic" change in the District's legal obligations. *2013 Termination Order*, 991 F. Supp. 2d at 37. Imposing a new structural injunction based on new facts found to demonstrate a violation of a whole new statute—none of which were adjudicated within the original Consent Decree, let alone consensually agreed to by the District—is out of Rule 60(b)'s bounds. *See Pigford v. Veneman*, 292 F.3d 918, 927 (D.C. Cir. 2002) ("Whatever tailoring method the district court ultimately adopts * * * it must preserve the essence of the parties' bargain[.]") (internal citation omitted).

In that same vein, it bears noting that the Plaintiffs themselves originally sought a brand new preliminary injunction to obtain the relief they wanted. It was not until almost three months later, after their preliminary injunction motion had been fully briefed, that the Plaintiffs decided to try the Rule 60(b) route. As it turns out, their first instinct that they were seeking a new injunction was the correct one.

*Second*, the district court's order provided relief for Subclasses of Plaintiffs and corresponding sections of the Consent Decree that had already been vacated or terminated. The new injunctive obligations sought to enforce compliance with the Affordable Care Act's provisions governing the initial eligibility for and renewal of Medicaid eligibility. *2016 Order*, 177 F. Supp. 3d at 443–444. But the Consent Decree's

Subclasses for Medicaid eligibility (Subclasses II and IV) were "[v]acate[d]," *2009 Vacatur Order*, and the district court's supervision "ended," No. 93-452, CONSENT MOTION TO VACATE SECTIONS II AND IV, ECF No. 1443 at 6. Likewise, in 2013, the district court "terminat[ed]" the Consent Decree's Medicaid Renewal Provisions, and "relieved" the District of any forward-going compliance obligation under the Consent Decree. *2013 Termination Order*, 991 F. Supp. 2d at 39. Whatever the scope of a district court's modification authority under Rule 60(b), it cannot resurrect vacated and terminated provisions as a vehicle for imposing novel obligations under a new law based on new facts.

The district court insisted that its order did not revive closed aspects of the Consent Decree, but instead gave effect to the "only [executory] portions" of the Consent Decree still "in force"—the Early Childhood Provisions governing notification for and the delivery of Early Childhood Services. *2016 Order*, 177 F. Supp. 3d at 426. The court reasoned that children must be eligible for Medicaid before they can receive such services. True enough. But the Consent Decree never contained an Early Childhood eligibility or renewal Subclass or corresponding sections of the Consent Decree. The Early Childhood Service Subclass, and the relevant provisions of the Consent Decree, were expressly limited to Medicaid *recipients*—that is, individuals who had already been determined to be eligible for Medicaid benefits. J.A. 271–272, 280. All issues concerning eligibility determination and redetermination matters were governed by the terminated Provisions. None of those Provisions continued in effect at the time of the district court's latest injunctive order.

The court's order also applies unqualifiedly to all Medicaid applicants and beneficiaries seeking renewal, without regard to whether they are children or have children.

The order, in other words, based a remedy of classwide structural reform on anecdotal evidence and individual testimonies, only a subset of which implicated the children for whose benefit the Early Child Services exist. Indeed, despite a lengthy recitation of Affordable Care Act implementation issues culled from a voluminous record, the district court cited only four instances where the putative Medicaid recipients even had eligible children. *See 2016 Order*, 177 F. Supp. 3d at 427–437.

The district court's new injunctive obligations, in short, have no anchor in the remaining executory portions of the Consent Decree and seek to provide benefits to many individuals wholly outside the remaining operative Subclass. Writing new injunctive obligations governing eligibility and renewal into Consent Decree provisions that never addressed those matters and extending the protections to individuals never included within the corresponding Subclass would turn the power to modify a consent decree into an injunctive blank check. "Who would sign a consent decree if district courts had free-ranging interpretive or enforcement authority untethered from the decree's negotiated terms?" *Pigford*, 292 F.3d at 925.

*Third*, and finally, this case vividly illustrates the hazards of an uncabined conception of Rule 60(b) modification. The district court imposed brand new injunctive commands on governmental operations without any of the ordinary protections for such exceptional relief. The district court resolved factual disputes in the record against the District. *See 2016 Order*, 177 F. Supp. 3d at 430, 441–443. The court then imposed the burden on the District to *disprove* the existence of a problem in need of classwide structural relief. *See id.* at 441–442. The court, in fact, acknowledged that, at the time of its new order, the District had made impressive progress in

improving its systems and that there were "zero individuals" in the case-processing backlog. *Id*. at 428. The district court nonetheless ruled that "individual errors combine to form systemic problems." *Id*. at 430.

Yet no such showing of a persisting structural breakdown was made on this record. The court made no factual finding of a pattern or high volume of eligibility or renewal delays. Instead, the district court faulted the District for not "*entirely* remediat[ing]" the problems arising from the transition to the Affordable Care Act. *Id*. (emphasis added). But a local government cannot be subjected to ongoing classwide structural relief simply because a problem has not been 100% eradicated. *See Lewis v. Casey*, 518 U.S. 343, 349 (1996) ("[T]he court's failure to identify anything more than isolated instances of actual injury renders its finding of a systemic [] violation invalid.").

Even crediting the district court's finding of a handful of individual processing errors by the District—disputed facts that were resolved without a hearing or discovery—the district court's assertion that it could not "separate individual mistakes" from "systemic" ones, *2016 Order*, 177 F. Supp. 3d at 437, admits the problem. Expansive, classwide structural relief that judicially superintends local government operations cannot issue based on a factual predicate consisting only of one-off errors that have, at best, a marginal connection to the only remaining executory portions of the Consent Decree. The burden was on the Plaintiffs to prove the existence of a continuing and widespread problem. By shoehorning the Plaintiffs' new injunction into a Rule 60(b) modification, the district court evaded that proof problem, finding it sufficient to enter a sweeping injunction just because it had "no assurance" that already-solved problems "w[ould] not arise again." *Id*. at 441. That gets Rule 60(b) exactly backwards. *See Horne*,

557 U.S. at 450 ("If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper.").

\* \* \* \* \*

The district court's imposition of sweeping new injunctive obligations to redress new factual problems arising under a new law and providing relief under no longer operative provisions of the Consent Decree cannot be forced into the mold of a Rule 60(b) modification.   For the foregoing reasons, we reverse the orders of the district court, vacate the modification, and remand for further proceedings consistent with this opinion.

*So ordered.*