# United States Court of Appeals

## For the Eighth Circuit

_____

No. 19-1340

_____

United States of America

*Plaintiff - Appellee*

v.

Junction City School District; R.L. Bolen, Superintendent of the Junction City
School District No. 75; Junction City School Board

*Defendants - Appellees*

v.

Arkansas Department of Education; Arkansas State Board of Education

*Intervenors - Appellants*

------------------------------

Brittany Harrison; Katelyn Williams; Lance Harrison; Chase Williams; Chasity
Klutts; Sarah McCoy; Cole McCoy

*Amici on Behalf of Appellant(s)*

_____

No. 19-1342

_____

Rosie L. Davis

*Plaintiff - Appellee*

v.

William Dale Franks

*Defendant - Appellee*

v.

Arkansas Department of Education; Arkansas State Board of Education

*Intervenors - Appellants*

_____

No. 19-1348
_____

Mary Turner, Individually and as next friend of Torrance Turner, a minor; Lucy Cheatham, Individually and as next friend of Andrew Cheatham, a minor; Mary Rose, Individually and as next friend of Victor Rose; Obie Sasser, Individually and as next friend of Frank Sasser, a minor; Barbara Dudley, Individually and as next friend of Kerri Dudley, a minor; Ida Dudley, Individually and as next friend of Tia Dudley; Rosie Blair, Individually and as next friend of Kimberly Blair, a minor; Johnny Blair, Individually and as next friend of Kimberly Blair, a minor; Robert Wise, Individually and as next friend of Valarie Wise, a minor; Mildred Thompson, Individually and as next friend of Kelona Thompson, a minor

*Plaintiffs - Appellees*

v.

Lafayette County School District

*Defendant - Appellee*

-2-

Larry Hudson, Individually and in his official capacity as Superintendent of Schools for the Lewisville School District No. 1, A Public Body Corporate; Hollis Sasser, Individually and in his official capacity as President of the Board of Education of the Lewisville School District No. 1, A Public Body Corporate; Harry Smith, Individually and in his official capacity as member of the Board of Education of the Lewisville School District No. 1, A Public Body Corporate; Leslie Nutt, Individually and in his official capacity as member of the Board of Education of the Lewisville School District No. 1, A Public Body Corporate; Steve Groves, Individually and as member of the Board of Education of the Lewisville School District No. 1, A Public Body Corporate; Carolyn Moss, Individually and as member of the Board of Education of the Lewisville School District No. 1, A Body Corporate; Johnny Ross, Individually and as member of the Board of Education of the Lewisville School District No. 1, A Body Corporate

*Defendant*s

v.

Arkansas Department of Education; Arkansas State Board of Education

*Intervenors - Appellants*

_____

No. 19-1349

_____

Larry Milton, on behalf of Himself and Infants Shanna Milton and Shana Milton, by next friend Shanna Milton, by next friend Shana Milton; Willie D. Harris, Dr.; on Behalf of Himself and Infant Mark Neil, by next friend Mark Neil; Bobbie Ray Cheeks, on Behalf of Infant Bobbie Ray, Jr., by next friend Bobbie Ray, Jr.

*Plaintiffs - Appellees*

Lee Nayles, Dr.; on Behalf of Himself and Infant Jon Nayles, by next friend Jon Nayles

*Plaintiff*

-3-

Terry Alexander

*Plaintiff - Appellee*

v.

Bill Clinton, Governor of the St. of AR; Individually

*Defendant*

Arkansas State Board of Education; Arkansas State Board of Education,

*Defendants - Appellants*

Jeff Starling, Member, Arkansas State Board of Education; Earle Love, Member, Arkansas State Board of Education; Robert L. Newton, Member, Arkansas State Board of Education; L. D. Harris, Member, Arkansas State Board of Education; Harry P. McDonald, Member, Arkansas State Board of Education; Alice L. Preston, Member, Arkansas State Board of Education; Elaine Scott, Member, Arkansas State Board of Education; Walter Turnbow, Member, Arkansas State Board of Education; Nancy Wood, Member, Arkansas State Board of Education; Camden, AR School District No. 35, The Board of Education of the, A Public Body Corporate; Camden, AR Housing Authority, The Board of Directors of the, A Public Body Corporate; Camden, AR, City of, A Public Body Corporate; Harmony Grove, AR School District, The Board of Education of the, A Public Body Corporate; Burton Burton, Director, Arkansas Department of Education

*Defendant*s

v.

Camden, AR Fairview School District, A Public Body Corporate

*Defendant - Appellee*
_____

-4-

Appeals from United States District Court
for the Western District of Arkansas - El Dorado and Texarkana
_____

Submitted: June 17, 2021
Filed: August 25, 2021
[Published]
_____

Before ERICKSON, MELLOY, and KOBES, Circuit Judges.
_____

PER CURIAM.

Four school districts in Arkansas sought modification of decades-old desegregation orders so that they could be exempt from a newly passed Arkansas school-choice law. The district court granted the school districts' motions and modified the desegregation orders to explicitly limit the transfer of students between school districts. The Arkansas Department of Education appealed, alleging that the modifications were improper.

Our panel previously affirmed the district court's modifications. The Arkansas Department of Education then moved for rehearing, at which point the United States—for the first time—involved itself in the case and asked us to reconsider our opinion. We accepted the invitation, received supplemental briefing from all of the parties, and now reverse the judgment of the district court.

I.  **BACKGROUND**

We first provide background regarding the four desegregation orders at issue in this case. We then discuss how the law in Arkansas regarding school choice has changed over the years to bring us to this point in the proceedings.

*A. Desegregation Orders*

1. Junction City School District

In 1966, the United States sued Junction City School District ("Junction City"), alleging that it was operating an unconstitutional, racially segregated school system. Junction City had a dual system, comprised of one set of schools for black children (the Rosenwald schools) and another set of schools for white children (the Junction City schools). In response to the lawsuit, Junction City adopted a "freedom of choice" plan, that allowed parents to choose to send their children to either the Rosenwald schools or the Junction City schools. Shortly thereafter, the Supreme Court handed down Green v. County School Board, 391 U.S. 430 (1968), which made clear that schools had an "affirmative duty" to "eliminate[]" racial discrimination "root and branch." Id. at 437–38. Following Green, it was plain that Junction City had an affirmative duty to eliminate the effects of its prior unconstitutional dual school system and that a freedom of choice plan was insufficient if it did not eliminate the racial segregation caused by the school district.

In response to this clear mandate, Junction City closed the Rosenwald schools and provided additional classrooms at the Junction City schools. It did so by adding portable buildings to the existing facilities. In 1970, Junction City was still operating segregated classes—with black children attending classes in the portable buildings and white children attending classes in the permanent facilities. The United States once again moved the district court to enjoin Junction City's discriminatory practices, specifically alleging racially discriminatory (1) class assignments, (2) bus routes, and (3) disciplinary treatment. The district court issued an order in response, which still governs Junction City today ("the 1970 order").

The 1970 order found that Junction City was segregating classes on the basis of race. Based on these findings, the district court enjoined Junction City from

continuing its discriminatory class assignments and ordered Junction City "to take immediate steps to reassign students to homerooms and individual classes on a non-racial and non-discriminatory basis."

The district court also found that Junction City had taken "no steps" since the court's prior order "to desegregate [its] transportation routes." Instead, with one exception, "[b]lack bus drivers transport[ed] only black students and white bus drivers transport[ed] only white students." It found that the "[w]hite and black bus routes [were] overlapping and duplicative." The court enjoined Junction City from continuing to operate discriminatory bus routes and ordered that it "immediately redraw [its] bus routes and reassign students to the busses on a non-racial basis."[1]

Notably, the 1970 order says nothing about other school districts or transfer students.

2. Hope School District No. 1A

In 1988, a group of plaintiffs filed suit against various officials at the Hope School District No. 1A ("Hope"), alleging that (1) Hope discriminated against black staff and students and (2) its at-large system for electing school-board members violated the Voting Rights Act. The plaintiffs sought "an injunction against the defendants' continuation of racial discrimination in any and all of its school operations, including faculty assignments, student assignments and student treatment within the school system." They also sought an injunction against the "continued use of an at-large election system for school board positions in [the] district." The voting-rights claim was settled early in the course of litigation and is not at issue.

---

[1]While the United States also alleged disparate treatment and punishment of black students and asked the district court to establish a commission to review the Superintendent's disciplinary decisions, the court did "not feel it . . . incumbent to order establishment of such a committee."

The discrimination claims were subsequently settled through a 1990 consent decree, which is at issue here.

As part of their discrimination claims, the plaintiffs broadly alleged that Hope discriminated against black employees and job applicants at all levels in the district. While much of the lawsuit was directed at the identified employment practices, the plaintiffs also alleged that the employment discrimination impacted "the educational opportunity afforded black children and otherwise contribute[d] to the current racial atmosphere in th[e] school system." For example, the plaintiffs alleged that black students were "disproportionately" suspended, expelled, or punished. The plaintiffs also complained that the school embraced a tracking system that assigned students "to classes on the basis of standardized test scores, faculty recommendations and past assignments." As a result, students were segregated "in classes by both race and socio-economic status." According to the plaintiffs, black students were "disproportionately assigned" to special-education, vocational, and basic classes, "while white, middle-class students" were "disproportionately assigned to college track and gifted and talented courses." The plaintiffs also alleged that certain programs at Hope were operated in a way that favored affluent and white students, including the cheerleading, golf, and tennis teams; the Honor Society; Beta clubs; Governor's School referrals and assignments; and Boy's and Girl's State referrals and assignments.

The discrimination claims were resolved through a consent decree that enjoined Hope from "engaging in any policies, practices, customs or usages of racial discrimination in any of its school operations including, but not limited to, faculty assignments, student assignments, and the treatment of black and other minority pupils within the school system." Among other things, Hope agreed to stop "tracking" students by "ability grouping[s]" and to "desegregate[] and integrate[]" (1) gifted and talented classes, (2) advanced-placement classes, (3) the cheerleading and basketball teams, (4) Beta clubs, and (5) referrals to Governor's school. Hope

also agreed to "maintain a unitary, racially nondiscriminatory school system wherein all schools are effectively and equitably desegregated and integrated."

Notably, the consent decree says nothing about other school districts or transfer students.

### 3. Camden-Fairview School District

In December 1988, a group of plaintiffs brought suit against a host of defendants, including (1) the Governor of Arkansas, (2) the Arkansas State Board of Education and its members, (3) the Director of the Arkansas Department of Education, (4) Camden School District, (5) the Board of Directors of the Camden Housing Authority, (6) the City of Camden, (7) Harmony Grove School District ("Harmony Grove"), and (8) Fairview School District.

The plaintiffs explicitly brought the case "to remedy interdistrict segregation" (and also to enforce rights under the Voting Rights Act). Plaintiffs sought consolidation of the Camden, Fairview, and Harmony Grove school districts. The Camden and Fairview school districts were both located in the City of Camden, with the Camden school district being mostly black and the Fairview school district being mostly white. Harmony Grove was a neighboring district that was about 90 percent white. Plaintiffs alleged that Harmony Grove—through various discriminatory actions—caused black parents and students to avoid its schools and instead seek educational opportunities in the Camden school district.

In 1990, while the litigation was active, the Camden and Fairview school districts (but not Harmony Grove) were consolidated. Multiple consent decrees were entered at that time. The decrees, among other things, required the new Camden-Fairview school district to fully desegregate its schools by the beginning of the next school year. The other governmental entities involved also agreed to various

remedies; for its part, Harmony Grove agreed to (among other things) "maintain an open admission policy in regard to non-resident black students" and refuse "the transfer of white students from" Camden-Fairview without its permission. Both Harmony Grove and Camden-Fairview agreed to "refrain from adopting student assignment plans or programs that have an interdistrict segregative effect on either district" and "agree[d] to work cooperatively to create interdistrict policies and programs to end the ravages of segregation."

Notably, Harmony Grove is the only school district alleged to have engaged in unconstitutional conduct that affected the racial composition of Camden-Fairview's student body.

In 2001, the parties entered a settlement agreement declaring that Camden-Fairview had achieved unitary status. As part of the settlement, the provision of the consent degree regarding Harmony Grove's transfer policy remained in full force and effect.

### 4. Lafayette County School District

In 1992, a group of plaintiffs brought suit against (what was then) Lewisville School District ("Lewisville"), alleging race discrimination. The case was resolved through a consent decree the following year, which enjoined Lewisville "from allowing a racially discriminatory environment to exist within the school district" and "from engaging in any policies, practices, customs or usages of racial discrimination in any school operation including, but not limited to, faculty assignments, student assignments, and the treatment of black and other minority pupils within the school system."

The Lewisville consent decree in many way mirrors the Hope consent decree. Lewisville agreed to "endeavor in good faith to eliminate any student placement or

assignment policy or practice such as 'tracking,' 'assignment by ability grouping,' or disproportionate placement in special education." While the district had a black student population of 58 percent, 70 percent of students placed into special-education classes were black; the consent decree noted that such disparities "may" exist in "other programs, classes or activities," and ordered Lewisville to "review such evidence with the objective of alleviating such disparities." The decree also prohibited "any student assignment or school involvement criteria which are tied to one's socio-economic status," including "gifted and talented classes, advanced placement classes, the cheerleaders, basketball teams, Beta type clubs and referrals to Governor's school, Boy's state and Girl's state." All schools were to be "effectively and equitably desegrated and integrated."

Notably, the consent decree says nothing about other school districts or transfer students.

In 2003, Lewisville was consolidated with Stamps School District, forming Lafayette County School District ("Lafayette"). Lafayette concedes that it is bound by the 1993 consent decree.

*B. Changes in the Law*

Around the time that most of these cases were being litigated, Arkansas adopted the Arkansas School Choice Act of 1989 ("1989 Act"), which allowed students to apply to attend a nonresident school district. See Ark. Code Ann. § 6-18-206 (repealed in 2013). The 1989 Act imposed some limitations on a student's ability to transfer to another school district, including prohibiting so-called "segregative transfers," or transfers of a student "to a nonresident district where the percentage of enrollment for the student's race exceeds that percentage in the student's resident district." Id.

-11-

In 2012, a district court in Arkansas struck down the 1989 Act.  See Teague ex rel. TT v. Ark. Bd. of Educ., 873 F. Supp. 2d 1055 (W.D. Ark. 2012).  It concluded that, because the 1989 Act "base[d] enrollment or transfer options solely on race," it violated the Equal Protection Clause of the Fourteenth Amendment.  Id. at 1068.  The court held that Arkansas "must employ a more nuanced, individualized evaluation of school and student needs, which, while they may include race as one component, may not base enrollment or transfer options solely on race."  Id.

In response to Teague, the Arkansas legislature enacted the Public School Choice Act of 2013, Ark. Code Ann. § 6-18-1901 et seq. (2013) ("2013 Act").  The 2013 Act made transfers more freely available to all student (regardless of race), but also allowed school districts to "declare" themselves "exempt[]" from the law if they were "subject to [a] desegregation order or mandate of a federal court or agency remedying the effects of past racial segregation."  Ark. Code Ann. § 6-18-1906(b)(1) (2013).  Junction City, Hope, and Camden-Fairview applied for exemptions starting in 2013.  Lafayette took part in school choice during the 2013-2014 school year, but (after losing thirty non-black students to interdistrict transfers) declared itself exempt the next year.

Two years later, Arkansas enacted the Public School Choice Act of 2015 ("2015 Act"), which eliminated a school district's ability to declare itself exempt from participating in school choice. Ark. Code. Ann. § 6-18-1906 (2015).  Under the 2015 Act, a district seeking an exemption was required to submit proof of an active desegregation order or plan to the Arkansas Department of Education.  If a school district submitted such proof, it could receive an exemption.  All four of the school districts applied for and received exemptions through 2017.

In 2017, Arkansas again amended its school-choice act. The 2017 amendments are before us today.  Under those amendments, a school district seeking an exemption from participating in school choice must submit proof of a desegregation plan or

order "that explicitly limits the transfer of students between school districts." Ark. Code. Ann. § 6-18-1906(a)(2) (2017). All of the districts applied for exemptions for the 2018-2019 school year. All of the applications were rejected except the Camden-Fairview application which was accepted in part. Camden-Fairview was found to have a "partial conflict" with school choice as it related to Harmony Grove; it was denied an exemption as it related to any other school district. Accordingly, all four of the school districts were required to participate in school choice. Unhappy with being denied exemptions because of the new requirement that a court order "explicitly limit[]" the transfer of students between school districts, the four districts filed motions for declaratory judgment, clarification of previous orders, or modification of previous orders, arguing that participating in school choice would have a segregative impact.

*C. Proceedings Below*

After an evidentiary hearing, the district court granted the school districts' motions to modify the desegregation orders to prohibit segregative interdistrict transfers. The court found that the repeal of the 1989 Act and the enactment of the 2017 amendments were significant changes in law. And based on the language and context surrounding the desegregation orders' adoption, the court determined that the orders were intended to prohibit any racial discrimination within the school districts. The Arkansas Department of Education appeals the district court's modification orders.

## II.    DISCUSSION

*A. Standard of Review*

Desegregation orders are subject to modification under Fed. R. Civ. P. 60. Under Fed. R. Civ. P. 60(b)(5), a district court "may modify a consent decree" if a

-13-

party shows that (1) there has been "a significant change in facts or law" that "warrants revision of the decree" and (2) "that the proposed modification is suitably tailored to the changed circumstance." Parton v. White, 203 F.3d 552, 555 (8th Cir. 2000) (per curiam) (quoting Rufo v. Inmates of Suffolk Cnty. Jail, 502 U.S. 367, 393 (1992)).

We review the district court's decision to modify a consent decree for abuse of discretion. Davis v. Hot Springs Sch. Dist., 833 F.3d 959, 963 (8th Cir. 2016). We will find an abuse of discretion where a court's decision was based on erroneous legal conclusions or clearly erroneous factual findings. Parton, 203 F.3d at 556.

*B. Application*

The Arkansas Department of Education alleges that the district court abused its discretion by modifying the consent decrees[2] because the 2017 amendments were not a significant change in circumstances supporting modification of the decrees and—even if they were—the district court did not impose a suitably tailored modification. We agree.

A consent decree may be modified if a change in factual conditions makes a decree "substantially more onerous" or "unworkable," or if a change in law makes "the obligations placed upon the parties" in the decree "impermissible" or "make[s] legal what the decree was designed to prevent." Rufo, 502 U.S. at 384, 388. When modifying the decree, courts must be mindful that their remedial powers are limited to remedying the initial constitutional violation. Freeman v. Pitts, 503 U.S. 467, 489 (1992). While school districts and states must "eliminate all vestiges of a dual

---

[2]The desegregation order that governs Junction City is technically not a consent decree, but the parties refer to all of the orders as "consent decrees" and apply the same modification standards to all four orders. We do likewise.

-14-

system," id. at 472, for a "vestige" to support an exercise of remedial authority, it must be traceable to the dual system, Missouri v. Jenkins, 515 U.S. 70, 89–93 (1995). Accordingly, when determining what remedial authority a court has, first principles dictate that "[a] remedy is justifiable only insofar as it advances the ultimate objective of alleviating the initial constitutional violation." Freeman, 503 U.S. at 489.

Here, the consent decrees (with one exception[3]) addressed constitutional violations that were related to discrimination *within* each school district—for example, operating dual schools or bus routes, or assigning students to advanced-placement and special-education classes in a discriminatory manner. These constitutional violations have nothing to do with interdistrict school transfers—and thus neither do the consent decrees that resolved the claims. Accordingly, the school districts cannot point to a "section of the consent decree" that the 2017 amendments had "an actual effect on." Davis, 833 F.3d at 964. Nor can they explain how the modifications at issue targeted a "vestige" of discrimination. See Jenkins, 515 U.S. at 89–93.

According to the school districts, modifying the consent decrees is necessary because, at the time that the decrees were entered, the parties relied on limitations that Arkansas law imposed on transfer students—specifically, either the general prohibition on transfers (in the case of Junction City), or the more limited prohibition on segregative transfers (in the case of Camden-Fairview, Hope, and Lafayette). But, even accepting this as true,[4] it implicitly admits that school transfers would be a *new*

---

[3]Because no party challenges the partial exemption that Camden-Fairview received with respect to Harmony Grove, we will ignore that issue moving forward.

[4]This is an interesting argument, given that the Camden-Fairview consent decree explicitly resolves problems related to interdistrict transfers (between Camden-Fairview and Harmony Grove). Moreover, our quick research revealed other cases, also resolved around this time, also explicitly dealing with problems stemming from interdistrict transfers. See, e.g., Davis, 833 F.3d at 961 (involving a 1991 consent

-15-

problem for the school districts, and that the district court is *expanding* the scope of its supervision without an underlying constitutional violation to justify such supervision. There is no "vestige" of discrimination that has anything to do with school transfers. In expanding the consent decrees to bar interdistrict school transfers, the district court impermissibly expanded the decrees to impose a new term outside the intended agreement of the parties. See, e.g., Salazar v. District of Columbia, 896 F.3d 489, 498 (D.C. Cir. 2018) ("When a [party] seeks to enhance a consent decree's terms, courts must be careful to ensure that the new injunctive terms give effect to and enforce the operative terms of the original consent decree. Courts may not, under the guise of modification, impose entirely new injunctive relief.").

Because no vestige of discrimination traces to interdistrict school transfers, the district court abused its discretion in expanding the consent decrees to prohibit such transfers.

We note that part of the problem in these cases stems from the nature of the litigation—namely, these are institutional-reform cases. Institutional-reform cases must be handled with caution, as they can create situations where defendants are "happy to be sued and happier still to lose." Horne v. Flores, 557 U.S. 433, 449 (2009) (citation omitted). Consent decrees entered in such cases "bind state and local officials to the policy preferences of their predecessors and may thereby 'improperly deprive future officials of their designated legislative and executive powers.'" Id. (citation omitted). When consent decrees are overbroad or outdated, they limit government officials' "ability to respond to the priorities and concerns of their

decree that explicitly adopted the 1989 Act's prohibition on segregative transfers); Little Rock Sch. Dist. v. Arkansas, 664 F.3d 738 (8th Cir. 2011) (involving 1988 and 1989 consent decrees that provided for magnet schools and majority-to-minority student transfers). These cases are evidence that, when constitutional problems stemmed from interdistrict student transfers, the issue was mentioned (and resolved) during the underlying litigation.

-16-

constituents." Id. (citation omitted). The courts "must vigilantly enforce federal law and must not hesitate in awarding necessary relief," but, they must also "remain attentive to the fact that" consent decrees "exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation.'" Id. at 450 (citation omitted). The school districts have not pointed us to a current condition in their districts that violates federal law, or a violation of federal law that will flow from them participating in school choice.[5]

Arkansas has chosen school choice as the policy of its state. Instead of directly challenging the policy chosen by their state's legislators, the school districts have come to federal court and asked a United States district judge to expand the scope of decades-old consent decrees in order to avoid complying with Arkansas's new school-choice law. Without the prerequisite showing that the current condition flows from a violation of federal law, this is not a job of a federal judge.

We also note that we have concerns about these desegregation orders continuing in place. The orders have been in place for decades; "[s]uch entrenched federal oversight should have raised red flags long ago." Shakman v. Clerk of Cook Cnty., 994 F.3d 832, 843 (7th Cir. 2021). It is unclear on this record if there is any reason for the continued federal oversight. Camden-Fairview has been (for the most part) declared unitary; the only provision still in effect today is a consent provision prohibiting transfers to Harmony Grove. The Junction City desegregation order has been dormant for over four decades. The Hope consent decree has been dormant for nearly two decades, except for the original parties jointly moving the district court to approve redrawing of boundaries for school-board seats. And the Lafayette consent decree has sat dormant for over two decades, save for the substitution of Lafayette for

---

[5]The school districts appear to believe that they have to maintain some sort of racial balance in their districts. The law does not require that. See, e.g., Freeman, 503 U.S. at 494 ("Racial balance is not to be achieved for its own sake. It is to be pursued when racial imbalance has been caused by a constitutional violation.").

Lewisville. The only interest in these long-dormant cases came after the 2017 amendments, when the school districts (the original constitutional violators) sought to expand the consent decrees (and concomitantly expand federal oversight) to a whole new arena of school operations. Given all of this, it may be wise for the district court to hold a unitary status hearing and consider removing these cases from the federal docket.

## III. CONCLUSION

For the foregoing reasons, we reverse the judgment of the district court and remand for proceedings consistent with this opinion.

MELLOY, Circuit Judge, dissenting.

I respectfully dissent. Given the evidence of white flight under the original consent decrees and the original lack of any need for the decrees to reference previously impermissible segregative interdistrict transfers, I would hold that the subsequent amendments to Arkansas law justify modification of the decrees. As such, I would hold the district court acted within its discretion. Davis v. Hot Springs Sch. Dist., 833 F.3d 959, 963 (8th Cir. 2016) (standard of review).

The Department argues, and the majority concludes, that because most of the original decrees do not discuss interdistrict transfers, the repeal of the 1989 Act and enactment of subsequent amendments—culminating in the 2017 Amendments—are not a substantial change in circumstances supporting modification. In my view, these arguments fail to accord proper weight to the context that gave rise to the decrees. In addition, these arguments fail to accord deference to the district court's factual determinations.

Consent decrees may be modified under Federal Rule of Civil Procedure 60(b). Smith v. Bd. of Educ. of Palestine-Wheatley Sch. Dist., 769 F.3d 566, 570 (8th Cir. 2014). Modification may be necessary where the laws or facts at issue at the time of issuance have changed or new ones have arisen. Pasadena City Bd. of Educ. v. Spangler, 427 U.S. 424, 437 (1976); Parton v. White, 203 F.3d 552, 555 (8th Cir. 2000) (per curiam) ("Modification may be appropriate when changed factual conditions make compliance with the decree substantially more onerous, a decree proves to be unworkable because of unforeseen obstacles, or enforcement of the decree without modification would be detrimental to the public interest."). The party seeking modification must establish a significant change in circumstances warranting revision of the decree. Smith, 769 F.3d at 570–71. If the moving party shows a significant change in circumstances, the court then considers if the proposed modification "is suitably tailored to the changed circumstances." Id. at 571.

Here, the district court found that the repeal of the 1989 Act and the subsequent enactment of the 2017 Amendments significantly changed Arkansas law in a manner allowing for modification of the consent decrees. The court examined the underlying orders and determined that the consent decrees "clearly intended to prohibit any racial discrimination occurring within" the Districts, "including preventing student transfers which result in segregation of [the Districts'] student body." The court specifically found that the original consent decrees did not explicitly bar interdistrict transfers because the 1989 Act already prohibited transfers where there was a segregative impact (or, in the case of Junction City, such transfers were not allowed in Arkansas when the decrees were entered). The court determined that the 2017 Amendments' requirement that a court order explicitly bar interdistrict transfers presented an unforeseen obstacle making the original consent decrees unworkable.

I agree that the laws influencing the consent decrees have clearly changed since the Districts entered into the agreements. Had Arkansas law not prohibited interdistrict transfers when the decrees were enacted, it is likely that the litigants

would have required that language similar to the district court's modification be included in the agreements. A plain reading of the consent decrees shows that they were intended to prohibit all forms of racial segregation. It was reasonable for the authors of the decrees to rely on existing laws to frame the agreements and not include provisions for actions already prohibited by those laws. See United States v. Knote, 29 F.3d 1297, 1300 (8th Cir. 1994) (stating that we cannot ignore the context in which a consent agreement was entered).

In crafting its modification order the district court considered the segregative issues stemming from the State's inaction in the face of white flight. The court heard evidence regarding the interdistrict transfers' effect on the Districts, including Lafayette County's loss of thirty non-black students in the only year it did not receive an exemption from participating in school choice. In Edgerson on Behalf of Edgerson v. Clinton, we stated that district courts are "uniquely situated to appraise the societal forces at work in the communities where they sit." 86 F.3d 833, 838 (8th Cir. 1996) (cleaned up). These appraisals include determining whether transfer policies caused white flight. See id. The court in Edgerson did not find that the transfer policies had caused white flight. Id. at 837. But here, segregative interdistrict transfers, in fact, had already negatively affected the Districts. It was not improper for the district court to consider these facts in its determination.

The evidence in the record amply demonstrates a white-flight problem in Junction City and a substantially negative impact on Camden-Fairview's and Hope's racial demographics. Multiple superintendents with decades of experience in southern Arkansas schools testified that white flight would be a problem in Junction City. As to the other Districts, all fifteen students requesting interdistrict transfers in Camden-Fairview were from non-black students. The former superintendent of Camden-Fairview (the superintendent when the district was declared unitary) testified that the 1989 Act's interdistrict transfer prohibition was "critical" to the district achieving unitary status.

-20-

Of the seventy interdistrict transfer requests from students in Hope, sixty-eight of them were from non-black students. Hope's superintendent testified that the percentage of non-black students making interdistrict transfer requests did not surprise him because he had discussions with white parents as to the reasoning why the parents wanted to move their children to a different school district. The reasons included, in part, because there was nobody in the child's grade to date; there was nobody to invite for sleepovers; and a disagreement with the morals of the student body. While it is true that only twenty-three students actually transferred from Hope, the low transfer rate was because the other students' requests were denied by the receiving school districts. But for the actions of other school districts denying applications, Hope could have lost 3% of its non-black student body, the maximum allowed under Arkansas law, in its very first year of school choice participation.

Both school years Lafayette County participated in school choice, Lafayette County lost the maximum 3% of its non-black student body allowed under the law, or very close to it. During the 2013-2014 school year, it lost over thirty of its students to interdistrict transfers. Each one of the transferring students was white. During the 2018-2019 school year, after its application for an exemption from school choice was denied, thirty-five students requested interdistrict transfers. Once again, each one of the transferring students was white. All but one of the students was accepted by other school districts.

Based on the foregoing, I find no error in the district court's decision to credit evidence of white flight when determining that a substantial change in circumstances warranted modification of the consent decrees.

The Department asserts that, even if the repeal of the 1989 Act and enactment of the 2017 Amendments together qualify as a substantial change in the law, the district court's modification is still an impermissible interdistrict remedy. The Department essentially argues that because the modification prohibits the Districts

from allowing their students to make segregative transfers, the district court's modification binds other school districts. I reject this argument.

A court cannot order an interdistrict remedy without showing an interdistrict violation. Milliken v. Bradley, 418 U.S. 717, 745 (1974); Edgerson, 86 F.3d at 837. A violation is interdistrict if it "caused segregation between adjoining districts." Missouri v. Jenkins, 515 U.S. 70, 94 (1995). Interdistrict remedies occur when a district court restructures or coerces local governments or their subdivisions. Liddell v. Missouri, 731 F.2d 1294, 1308 (8th Cir. 1984) (en banc) (citing Hills v. Gautreaux, 425 U.S. 284, 298 (1976)).

Our court has not found an interdistrict remedy where a district court's action does not threaten the autonomy of a separate governmental body. In Liddell, the court required the State to pay the cost for voluntary interdistrict transfers. Id. We stated that requiring the State to bear the transfer costs "does not threaten the autonomy of local school districts; no district will be coerced or reorganized and all districts retain the rights and powers accorded them by state and federal laws." Id.

Here, the district court's remedy does not threaten the autonomy of any other school district. The modification's only potential effect on other school districts is a possible decrease in transfer requests from the Districts' students. Transfers out of the Districts may still occur, no matter the race of the student, as long as there is an educational or compassionate purpose and the request is approved by the student's school board. Limitations are placed only on the ability of a student to leave one of the Districts. These requirements do not limit or set boundaries on other school districts' rights or powers to accept transfer students into their districts once the students have been approved to transfer out of their original school. By restricting the conditions under which students can transfer out of the Districts, the district court placed limitations on only the Districts, not on any other school district in the state

-22-

of Arkansas. The district court has not restructured or coerced local governments, so the modification of the consent decrees does not impose an impermissible interdistrict remedy.

Based on my review of the record, and the large degree of deference owed the district court that entered the consent decree, I find no abuse of discretion. In reaching the opposite conclusion, the majority focuses on select details of the original decrees to the exclusion of their overall purpose in a manner that discounts the context of pervasive segregation the decrees sought to address. The majority also emphasizes the need to minimize federal judicial intervention in the state's current legislative and executive affairs. In my view, because the modifications have a limited to nonexistent effect on other school districts' autonomy, the judicial interference that troubles the majority is adequately constrained in this instance. I would affirm.

_____